**In re TMI LITIGATION CASES CONSOLIDATED II.**

**This Document Relates to All Plaintiffs.**

**Civil Action No. 1:CV–88–1452.**

United States District Court,
M.D. Pennsylvania.

April 5, 1996.

Arnold Levin, Philadelphia, PA, Lee C. Swartz, Hepford, Swartz & Morgan, Harrisburg, PA, for Levin—1704 plaintiffs.

Dusan Bratic, Bratic & Portko, Dillsburg, PA, Louis M. Tarasi, Jr., Tarasi & Johnson, P.C., Pittsburgh, PA, for Tarasi—350 plaintiffs.

Peter J. Neeson, LaBrum & Doak, Philadelphia, PA, for Neeson—4 plaintiffs.

Terry S. Hyman, Harrisburg, PA, for Hyman—1 plaintiff.

Robert S. Mirin, Harrisburg, PA, for Mirin—1 plaintiff.

Shawn A. Bozarth, Harrisburg, PA, for Bozarth—1 plaintiff.

Joseph D. Shein, Philadelphia, PA, for Shein—2 plaintiffs.

Alfred H. Wilcox, Pepper, Hamilton and Scheetz, Philadelphia, PA, Lewis S. Kunkel, Jr., Pepper, Hamilton & Scheetz, Harrisburg, PA, Fred Speaker, Camp Hill, PA, for General Public Utilities Corporation, Babcock & Wilcox Company, Pennsylvania Electric Company, Jersey Central Power & Light Co., Metropolitan Edison Company, McDermott Incorporated, Raytheon Constructors Inc., Burns and Roe Enterprises, Inc., and Dresser Industrial Valve and Instrument Division of Dresser Industries, Inc.

Charles B. Zwally, Michael D. Reed, Mette, Evans & Woodside, Harrisburg, PA, Augustine V. Cheng, Associate General Counsel, Office of the General Counsel, New York City, for George Colbert.

## MEMORANDUM

RAMBO, Chief Judge.

On April 2, 1996, the court issued a memorandum of law ruling in part on Defendants' motion *in limine* to exclude Plaintiffs' medical causation experts. Remaining before the court is the balance of that motion, including challenges to the proffered testimony of Thomas Winters, Theodor Sterling, Sigmund Zackrzewski, David Lochbaum, Joseph Cardinale and Jose Galindo, Jr. A statement of the factual background of the case and discussion of the legal standards governing the admission of expert scientific testimony can be found in this court's memorandum of law dated January 6, 1996. *In re TMI Litigation Cases Consolidated II*, 911 F.Supp. 775 (M.D.Pa.1996). The court will now reach the remaining *in limine* challenges.

### I. *Dr. Thomas Winters*

Dr. Winters is a medical doctor, board certified in internal and occupational medicine, (Tr. at 1206), and eligible for certification in infectious diseases. He is the medical director for employee health, and director of a clinic on occupational medicine at Carney Hospital in Boston, Massachusetts. (Tr. at 1199, 1211.) Dr. Winters is also a Clinical Associate Professor of Medicine at the Boston University School of Medicine and a Visiting Lecturer in Occupational Medicine at the Harvard University School of Public Health. (2/27/95 Winters Rpt. at 1.) Based upon his review of all of the test Plaintiffs' medical records, and his personal examination of the living test Plaintiffs, Dr. Winters offers his opinion that each of the test Plaintiffs' neoplasms were caused by their exposure to ionizing radiation during the TMI accident. Defendants' specific challenges relating to the admissibility of Dr. Winters' proffered testimony will be addressed in the context of the court's *Daubert/Paoli II* analysis.

### A. *The Daubert/Paoli II Analysis*

#### 1. Is the Methodology Based Upon a Testable Hypothesis?

When asked during his deposition whether he started his evaluation with a hypothesis, Dr. Winters replied that he "start[ed] with no hypothesis." (6/23/95 Winters Dep. at 72.) Dr. Winters distinguished his study from general epidemiological studies and stated that without a hypothesis, he simply applied his methodology to each case. (*Id.* at 73.) According to the *Paoli II* court, "differential diagnosis can be considered to involve the testing of a falsifiable hypothesis ... through an attempt to rule out alternative causes." *Paoli II*, 35 F.3d 717, 758 (3d Cir.1994). To determine whether Dr. Winters tested his hypothesis, the court must determine whether he performed a differential diagnosis. According to Dr. Winters' deposition testimony, he reviewed the medical records of all of the test Plaintiffs and performed physical examinations upon those test Plaintiffs that are still living. (6/23/95 Winters Dep. at 72, 73, 81–82.) Pursuant to *Paoli II*, Dr. Winters examined the information necessary to make a differential diagnosis. *Paoli II*, 35 F.3d at 762. As such, whether or not Dr. Winters realized it, his differential diagnosis was essentially an attempt to verify or falsify the hypothesis that the TMI Plaintiffs developed their neoplasms as a result of exposure to ionizing radiation during the TMI accident. The court finds that to the extent that it is relevant to mak-

ing a differential diagnosis, Dr. Winters' methodology is based upon a testable hypothesis. This factor will weigh in favor of the admission of the proffered testimony.

### 2. Has the Methodology Been Subject to Peer Review?

At the *in limine* hearing, Dr. Winters testified that his methodology, as applied in a radiation case, has not been subject to peer review. (Tr. at 1355–56.) Insofar as Dr. Winters methodology is a differential diagnosis, the Third Circuit has recognized that "differential diagnosis generally is a technique that has widespread acceptance in the medical community, has been subject to peer review, and does not frequently lead to incorrect results...." Despite the general presumption that a differential diagnosis methodology has been subject to peer review, Dr. Winters testified that his radiation causation differential diagnosis has not been subject to peer review. In light of *Paoli II* the court finds this factor to be of diminished relevance in the context of a differential diagnosis. However, to the extent that it is relevant, this factor will weigh against the admission of the proffered testimony.

### 3. Is There a Known or Potential Rate of Error?

■ Although a differential diagnosis "does not frequently lead to incorrect results," *Paoli II*, 35 F.3d at 758, "to the extent

that a doctor utilizes standard diagnostic techniques in gathering this information, the more likely" the methodology will be found to be reliable. *Id.* Defendants' arguments with respect to the potential rate of error in Dr. Winters' methodology relate to the diagnostic techniques that he used and failed to use.[1] First, Defendants contend that Dr. Winters based his opinion in part upon the unfounded assumption that Plaintiffs were exposed to 10 to 300 rems of radiation, and that exposure anywhere in that range would produce the kinds of effects that were observed. During his deposition, Dr. Winters explained that he "knew the dose was above a hundred rems, and figured that even if it dropped down to the 50– or 10–rem area, [his] ... opinion would still be the same." (6/23/95 Winters Dep. at 80.) It is unclear how Dr. Winters "knew" the dose rate. In his deposition Dr. Winters indicated that prior to conducting his analysis he "had *reviewed* the Hatch articles in American Journal of Public Health, American Journal of Epidemiology ... [and] had reviewed pictures of trees and had *heard* that Dr. Gunckel had evaluated and Dr. Shevchenko had looked at dendritic samples that showed a significant dose of radiation."[2] (*Id.* at 76.)

Dr. Winters' method of gathering exposure and dose information introduce a potentially high rate of error into his analysis. The scientific literature supports the proposition

---

1. A hypothetical that appears in a footnote in *Paoli II,* is instructive:

> We note that it is not only simple cases that could justify a finding of reliability absent employment of a significant number of diagnostic techniques. Imagine a patient who comes to a physician with medical records demonstrating illness A known to be strongly associated with chemical X *and evidence of exposure to that chemical.* Also, imagine that there are other chemicals, foods, or other substances to which the patient has been exposed which sometimes, though much less frequently, cause this same illness. With a basic understanding of probabilities, a physician might very well be able to reliably conclude that a person exposed to chemical X was more likely than not to have contracted illness A as a result of that exposure than as a result of any other cause.

*Paoli II,* 35 F.3d at 760 n. 30 (emphasis added). From this hypothetical the court infers that evidence of exposure is important to the analysis, and that where a causal analysis is made without

proper evidence of exposure, conclusions generated by the analysis would be potentially unreliable.

2. Contrary to both his original report and his deposition testimony, Dr. Winters' testimony at the *in limine* hearing was as follows:

> The critical steps start with defining the exposure which I did ... using data from Vergeiner, the meteorologic data, Beyea's dispersion dosimetry from the Hatch–Susser article, Shevchenko's literature supporting the abnormalities of trees and the dicentrics, Tarasenko's review which delineated T-lymphocyte defects in the study population, and finally Daniel who is a defendant witness ... (Tr. at 1315.) The testimony appears to be consistent with his supplemental affidavit, filed February 26, 1996. The court has, however, excluded all reports and supplemental affidavits filed after January 5, 1996. Accordingly, the court will consider only the timely filed report and deposition testimony.

that below a dose of 10 rems, there is no direct evidence of a causal relationship between exposure to ionizing radiation and cancer induction. National Research Council, Committee on the Biological Effects of Ionizing Radiation, *Health Effects of Exposure to Low Levels of Ionizing Radiation* at 7 (National Academy Press 1990) ("BEIR V") (noting that "[a]ssessment of the carcinogenic risks that may be associated with low doses of radiation entails extrapolation from effects observed at doses larger than 0.1 Gy [(10 rems)] and is *based on assumptions about the relevant dose effect relationships and the underlying mechanisms of carcinogenesis*"). To the extent that Dr. Winters presumed a dose of greater than 10 rem, without having gathered reliable data to support that presumption, his differential diagnosis has a high probability of being incorrect.

Next, Defendants contend that data from the study of populations exposed to radiation indicate that where a study fails to consider factors such as a specific organ dose, the effect of a person's age at the time of exposure, the time since exposure, and the effect of the sex of the person on their risk of developing the type of cancer they exhibit, any conclusion regarding a causal relation between radiation exposure and a given health outcome is subject to substantial error. The International Commission on Radiation Protection ("ICRP")[3] has observed that "[t]he relationship between the probability[4] of stochastic effects and equivalent dose is found also to depend on the organ or tissue irradiated. It is therefore appropriate to define a further quantity, derived from equivalent dose, to indicate the combination of different doses to several different tissues[5] in a way which is likely to correlate well with the total of stochastic effects." ICRP Pub. 60, Annals of the ICRP, "1990 Recommendations of the International Commission on Radiological Protection" 6 (Pergamon Press 1991) (footnote added). This ICRP report also supports Defendants' assertion that sex and age at the time of exposure are "[b]iological factors affecting cancer induction" following exposure to ionizing radiation, that should be considered when making a causal inference regarding radiation exposure and cancer induction. *Id.* at 120–22.

The court, as it did with this component of Dr. Fajardo's methodology, finds it difficult to quantify the effect that the omission of the referenced data might have had upon the overall analysis. It is apparent that the omission of this data introduced at least a moderately high potential rate of error into the final diagnosis. In *Paoli II*, the Third Circuit held that where a physician offered a differential diagnosis which found a causal link between PCB exposure and subsequent health effects, and where the defendants then offered an alternative cause for the plaintiffs' health effects, the expert "had to offer a good explanation as to why their conclusion remained reliable." *Paoli II*, 35 F.3d at 762. To a limited extent, the court finds Dr. Winters' failure to consider certain data, Defendants' direct challenge on that subject, and Dr. Winters' subsequent failure to offer a "good explanation" for the omission to be analogous to the *Paoli II* scenario. However, where the *Third Circuit* has clearly expressed its opinion as to the general reliability of differential diagnosis, and the more liberal standard under which this court must evaluate such a diagnosis, the court is finds that the failure to consider certain potentially

---

**3.** The ICRP, initially established in 1928, began making recommendations regarding radiological protection in 1977. ICRP Publication 60, Annals of the ICRP, "1990 Recommendations of the International Commission on Radiological Protection" vii, 1 (Pergamon Press 1991) ("ICRP Pub. 60"). The ICRP defines the aims of their recommendations as follows:

 (a) to take account of new biological information and of trends in the setting of safety standards,

 (b) to improve the presentation of the recommendations,

 (c) to maintain as much stability in the recommendations as is consistent with new information.

ICRP Pub. 60 at vii.

**4.** "Stochastic effects are those which result from alterations in normal cells caused by an ionising [sic] radiation event which is assumed to have a low probability of occurrence in cells at low doses." ICRP No. 60 at 106.

**5.** This is commonly referred to as the organ or tissue dose.

relevant data goes to the weight of the testimony.

Because the court is unable to quantify the effect that Dr. Winters' omissions had upon the reliability of his findings, the court will weigh this factor neither in favor nor against the admission of the proffered testimony.

### 4. Were There Standards Controlling the Technique's Operation?

Defendants contend that the lack of standards controlling Dr. Winters' differential diagnosis is evidenced by his "consistently ignor[ing] epidemiologic data that was not consistent with his ultimate conclusions on causation," and his misplaced reliance on toxicological texts as providing the standards governing his methodological approach. (Defs.' Findings at 130–31.) During his deposition, Dr. Winters provided the following statement of his methodology:

> I used the methodology of occupational, standard toxicology, occupational health evaluations, where you look at a condition, you look at the dose, the dose response, you make sure there's adequate latency period, you make sure there are no other confounding contributing factors. You make sure that the illness is, in fact, caused, or the disease is, in fact, caused by the agent, which is radiation in this case, and you make a logical deduction at the end of that.

(6/23/95 Winters Dep. at 72.) The court finds Dr. Winters' failure to consider the importance of calculating a specific organ dose to evidence an absence of a standard controlling the operation of his technique. However, the court also finds evidence on the record that Dr. Winters did employ some important standards such as considering relevant latency periods and considering possible confounding factors. Accordingly, the court finds that because there is evidence that some important standards were employed, Defendants' challenges go to the weight, and not the admissibility, of the proffered testimony. This factor will weigh in favor of the admission of the proffered testimony.

### 5. Is the Methodology Generally Accepted?

It is unquestionable that as a general proposition, the use of differential diagnosis in the medical field is well accepted. The issue, though, is whether it is generally accepted to infer a causal relationship between a possible exposure to ionizing radiation and a subsequent health effect based solely upon a differential diagnosis. In connection with its evaluation of the Fajardo proffer, the court found that such an inference is not generally accepted. *In re TMI*, 922 F.Supp. 997, 1036 (M.D.Pa.1996) (quoting the NCRP's finding that " 'it is not possible, on the basis of medical evaluation, to unequivocally prove or disprove a claim that a specific malignancy was caused by a specific radiation exposure' "). Despite this finding, the court found this factor to weigh in favor of the admission of the Fajardo proffer. The court found that through his report and testimony, Dr. Fajardo did not represent that he had "unequivocally prove[n]" that Plaintiffs' neoplasms were causally related to radiation exposure during the TMI accident. Dr. Fajardo's conclusion is based upon a presumption that other of Plaintiffs' experts will establish the actual exposure to the requisite dose.[6]

---

6. Plaintiffs have often advanced the argument that their expert testimony should be viewed as a cohesive whole rather than segmented. As a general proposition, the court agrees that, at their peril, Plaintiffs are free to make a tactical decision to intertwine the testimony of various experts. This approach has proven to be detrimental to Plaintiffs with respect to several of their dose experts. In several instances, key assumptions made by expert A, upon which expert B's testimony was based, were found to be scientifically unreliable. Thus, the exclusion of expert A's testimony left a gap in the data upon which expert B relied. This gap often contributed to the court's finding that expert B's testimony was scientifically unreliable.

Dr. Fajardo's proffered testimony provides an example of a situation where Plaintiffs' tactical decision works. In theory, Plaintiffs can present certain experts to testify as to dose and others to testify as to causation. It is not unreasonable, in theory, for a causation expert to make his or her opinion contingent upon a different expert establishing a given dose. To the extent that Plaintiffs fail to establish dose at the summary judgment stage or trial, the court would have grounds to preclude medical causation testimony based upon the presumption that Plaintiffs were exposed to a given dose. At this juncture, however,

Accordingly, insofar as the court must presume at this stage that Dr. Winters' proffered testimony will be supported at trial by evidence that the test Plaintiffs were exposed to in excess of 10 rems of ionizing radiation; and, insofar as other experts will present testimony that provides "another basis for judgment as to causation," NCRP Stmt. No. 7 at 1, the court finds that this factor weighs in favor of the admission of the proffered testimony.

### 6. Is There a Relationship Between the Technique and Methods That are Established to be Reliable?

Defendants' argue that Dr. Winters' methodology bears little resemblance to methods established to be reliable. While Dr. Winters' methodology does not closely resemble established methods, it does bear some resemblance. To the extent that Dr. Winters has made a medical differential diagnosis, his methodology comports closely with established and reliable methods. Conversely, to the extent that in making a causal inference he is actually engaged in a risk assessment, Dr. Winters' methodology bears little resemblance to established methods. On the balance, the court finds that because his methodology bears some relationship to established methods, this factor weighs in favor of the admission of the proffered testimony.

### 7. What are the Qualifications of the Expert Based Upon the Methodology?

Defendants argue that Dr. Winters is not qualified to testify as an expert in radiation health effects. Specifically, Defendants contend that Dr. Winters' review of scientific literature on the epidemiologic studies of populations exposed to radiation does not establish him as an expert in the field. In addition, Defendants note that one other district court has found that Dr. Winters was "not qualified to testify on either the general or specific causal relationship between radiation and the induction of [acute lymphocytic leukemia]." *Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 25 (D.Ma.1995). The Third Circuit recently reaffirmed its liberal approach regarding the qualifications factor of the Rule 702 analysis in *Holbrook v. Lykes Bros. Steamship Co.*, 80 F.3d 777, 782 (3d Cir.1996). Specifically, the Third Circuit explained that:

> Because of our liberal approach to admitting expert testimony, most arguments about an expert's qualifications relate more to the weight to be given the expert's testimony, than to its admissibility. Thus, witnesses may be competent to testify as experts even though they may not, in the court's eyes, be the "best" qualified. Who is "best" qualified is a matter of weight upon which reasonable jurors may disagree. . . . Following this logic, it is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate.

*Holbrook*, 80 F.3d at 782. Dr. Winters certainly may not be the "best" qualified expert in this area. Moreover, it cannot be taken lightly that he has been precluded from giving the same type of testimony in other litigation on the basis of his lack of qualifications. Nevertheless, Dr. Winters is a practicing physician who has demonstrated at least a basic knowledge of the relevant scientific principles. Pursuant to *Holbrook* and *Paoli II* this court is bound to liberally construe the qualifications prong of the Rule 702 analysis. Accordingly, this factor weighs in favor of the admission of the proffered testimony.

### 8. Are There Non–Judicial Uses of the Methodology?

Dr. Winters performs differential diagnoses in a variety of settings connected with his medical practice. It is questionable whether the specific methodology used in this case to determine whether radiation caused specific cancers has been employed outside of litigation. This factor will weigh neither in favor nor against the admission of the proffered testimony.

the court is not ruling upon the sufficiency of Plaintiffs' evidence. Thus, for now, it is appropriate for the court to accept medical causation testimony that is based upon the presumption that other experts will establish a threshold dose.

## 9. Conclusion

Based upon its Rule 702 reliability analysis, the court finds the proffered testimony of Dr. Winters' to be scientifically reliable.

### B. *Rule 702 Fit, Rule 703 and Rule 403 Analyses*

 If permitted, Dr. Winters will offer his opinion that each of the test Plaintiffs' neoplasms were induced by their exposure to ionizing radiation during the Three Mile Island Accident. Presuming that Plaintiffs present evidence that corroborates Dr. Winters' assumption regarding the dose of radiation received by the test Plaintiffs, Dr. Winters' causation testimony will have the requisite "fit" with the case. At this stage, the court finds that Dr. Winters' proffered testimony "fits." [7] With respect to Rule 703, the court finds that Dr. Winters relied upon the type of data that a medical professional would rely upon in making a differential diagnosis. Defendants' challenges with respect to data that Dr. Winters failed to consider go to the weight of his testimony. Finally, the court finds that the proffered testimony is not so confusing as to warrant exclusion pursuant to Rule 403. Based upon the foregoing, the court will admit the proffered testimony of Dr. Winters.

## II. *Dr. Theodor Sterling*

Dr. Sterling is a Professor on the faculty of Applied Sciences in the School of Computing Science at Simon Fraser University in Burnaby, British Columbia, Canada. Before the court is Dr. Sterling's initial report, dated April 25, 1995, and a supplemental affidavit, dated February 2, 1996. In accordance with its memorandum of law dated April 2, 1996, the court will exclude Dr. Sterling's untimely 1996 affidavit. Accordingly, the court will proceed with its evaluation of the Sterling proffer based upon the timely filed report and his *in limine* testimony to the extent it is not beyond the scope of his report.

[7.] The court reserves the right to reconsider this determination based upon the dose evidence pre-

### A. *The Proffered Testimony*

 Dr. Sterling testified at the hearings that he performed an epidemiological analysis on certain groups of data relating to the TMI area. (Tr. at 1090.) In the introduction to his report, Dr. Sterling gives the following brief discussion of each cohort and the statistical analysis performed on the cohort:

**The Hesteco Garment Workers:** A cohort of 69 women employed by Hesteco Manufacturing Co. and present at the factory premises at the time of the accident. Ten women have developed cancer since then. This number of cancers is greater than would be expected had the cohort developed cancer at the same incidence rate as a comparable group of women selected from the general population.

. . . . .

**The Harrisburg School Children:** A cohort consisting of 1991 students attending four Harrisburg elementary schools at the time of the accident. At least six of these students have developed cancer. This number of cancers is greater than would be expected had the cohort developed cancer at the same incidence rate as a comparable group of children selected from the general population.

**The Ten Mile Cohort:** A cohort consisting of all persons under the age of 25 years at the time of the accident, living within a ten mile radius of Three Mile Island. This cohort showed a dramatic increase in leukemia incidence rates following the accident.

**First Trimester Infants:** The cohort of infants born to mothers who were in the first trimester of pregnancy at the time of the accident, and who lived within a 10 Mile radius of Three Mile Island. This cohort shows a greater incidence of congenital malformations than a cohort of infants born to mothers of the same region who became pregnant after the accident, and than a cohort of infants born in Atlanta from 1968 to 1979.

sented to the court at either the summary judgment stage or at trial.

4/25/95 Sterling Rpt. at 3–4. Dr. Sterling's report also contains an analysis of a cohort consisting of high school softball players. Plaintiffs have withdrawn this cohort from the proffered testimony.

## B. *Discussion*

The Federal Judicial Center's Reference Manual on Scientific Evidence provides a sound starting point for the court's discussion of Dr. Sterling's proffered testimony. The manual makes the following observations regarding epidemiological analyses:

> While the findings of epidemiology always involve a measure of uncertainty, systematic methods for assessing the characteristics of persons included in the study and their risk of disease can be used to help rule out known sources of *bias* and *error.*
>
> The epidemiologist uses *sample size* calculations and inclusion and exclusion criteria for identifying exposed and unexposed study groups ... to reduce potential error and bias in a study. These methods and techniques of epidemiology provide a means of assessing the relationship between a disease and its causes.... [T]he precision of epidemiological methods is based on the stability of studying large numbers of people. There should be a sufficiently large number of subjects, so that a small change in the number of people with the disease does not appreciably affect the results of the study.

Ref.Man. at 127. With respect to the design of a cohort study, the Reference Manual notes that "[a] list of criteria for inclusion in and exclusion from the study must be articulated by the researcher. These criteria should be documented clearly before the subjects are recruited for the study to ensure that no overt or covert biases enter into the selection process. Such biases could lead to erroneous inferences regarding the selection process." *Id.* at 138. The Third Circuit has recognized the errors that can result from improper data collection. In *DeLuca v. Merrell Dow Pharmaceuticals, Inc.,* 911 F.2d 941, 955 (3d Cir.1990), *cert. denied,* —— U.S. ——, 114 S.Ct. 691, 126 L.Ed.2d 658 (1994), the court noted in *dicta* that "[f]aulty data collection resulting from design or execution flaws, for example, can create a much greater risk of error than sampling error. Thus, a poorly conceived or conducted study that disproves the null hypothesis at a .01 level of significance may be far less reliable than a well conceived and conducted study that is significant at a .1 level." *Id.* The court went on to hold that "any assessment of reliability under Section 702 should be conducted with an eye to all the risks of error posed by the proffered evidence." *Id.* It is with this "eye toward risks of error" that the court turns to its analysis of the Sterling proffer.

The court's review of the Sterling proffer, including his timely report and *in limine* hearing testimony, raises troubling questions about Dr. Sterling's study design or lack thereof. Dr. Sterling's report does not include a discussion of his study design. On cross examination at the hearing, Dr. Sterling testified as follows:

Q How did you go about looking for the groups that you analyzed here?

A We were contacted by Mrs. Aamodt and Mr. Aamodt who had done some additional—had some done work, and we were asked to calculate risks for these groups.

Q So they selected the groups and provided you with the data, and then you did the statistical calculations regarding the data that they provided?

A That is correct.

(Tr. at 1092.) Thus, prior to receiving the data, Dr. Sterling had no role in the conduct of the study. Were Mr. and Mrs. Aamodt epidemiologists who had independently developed a study design which included an articulation of their selection criteria, the court would not find Dr. Sterling's lack of involvement to pose a problem. To the court's knowledge, however, the Aamodts are neither epidemiologists nor experts in any other scientific discipline. The Aamodts have been identified as "consultants" to Plaintiffs in the context of this litigation. They are not listed as expert witnesses and have not supplied any expert reports for this case. Accordingly, Dr. Sterling's reliance upon the Aamodts to develop a selection criteria for his statistical analysis poses a grave problem.

First, there is no evidence on the record from which the court can make any judgment regarding the qualifications of the Aamodts to create and execute the selection portion of an epidemiological study design. Second, and more important, because there is no record evidence which describes what the Aamodts' selection criteria were, Defendants would be unable to cross examine on this important issue. Therefore, even if the court were to stretch the liberal admission standard of Rule 702 to its limit by admitting the testimony, the purpose of the liberal admission policy would nevertheless be frustrated. That is, Defendants would not have the opportunity to influence the amount of weight that the jury might accord to the study because there is no record of evidence from which they could cull their cross examination of Dr. Sterling regarding the selection criteria for the study. Finally, the court finds the lack of a clearly articulated selection criteria for the statistical analysis subjects the results to an enormous potential rate of error.

Based upon the foregoing, the court will exclude the proffered testimony as scientifically unreliable pursuant to Rule 702. In addition to the study's lack of scientific reliability, the court finds, pursuant to Rule 703, that Dr. Sterling improperly relied upon data that other experts in the field would find to be unreliable.

### III. *Dr. Sigmund Zakrzewski*

Dr. Zakrzewski has a Ph.D. in biochemistry, and has spent his entire career in cancer research. Although he is now retired, Dr. Zakrzewski spent most of his career as a cancer researcher at the Roswell Park Cancer Institute in Buffalo, New York.[8] Dr. Zakrzewski indicates that he was contacted by Plaintiffs in 1993 and asked "to review cases of different types of cancer that erupted in the proximity of the Three Mile Island (TMI) nuclear power plant, allegedly due to the release of radioactivity resulting from the nuclear accident at that plant on March 28, 1979." 9/15/95 Zakrzewski Aff. at 1. Before

the court are Dr. Zakrzewski's timely filed report, a supplemental affidavit filed February 1, 1996, his deposition testimony, and his *in limine* hearing testimony. In accordance with this court's memorandum of law dated April 2, 1996, the court will consider only the timely filed report, the deposition testimony and the hearing testimony to the extent that it does not exceed the scope of the report or deposition testimony.

### A. *The Proffered Testimony*

In his report, Dr. Zakrzewski concludes that "the four cases of leukemia discussed here [ (Plaintiffs Beam, Obercash, Villella and Macri) ] were most likely caused by exposure to radiation released during the TMI accident," 9/15/95 Zakrzewski Rpt. at 4, "the three cases of the thyroid cancer [ (Plaintiffs Dolan, Gaughan, and Peterson) ] were most likely caused by a radioactive fallout resulting from the accident at TMI," *id.* at 5, and "the most likely cause of the plaintiff's osteosarcoma [ (Plaintiff Ward) ] is exposure to a radioactive fallout originating from the nuclear accident at TMI. In the two other cases, i.e., breast cancer ( [Plaintiff Hickernell] ) and ovarian cancer ( [Plaintiff Hilt] ) the whole body exposure to radiation are the most likely causes." *Id.* at 7. At the outset of his report, Dr. Zakrzewski lists a number of factors which he considered in making his evaluation. These factors are as follows:

1. The type of cancer;

2. age of the victims at the time of the accident;

3. occupation at the time of the accident;

4. whereabouts of the victims at the time of the accident;

5. latency period between alleged exposure and diagnosis;

6. other cancer cases in the neighborhood of the plaintiff's residence or the place of business;

---

**8.** Dr. Zakrzewski was first associated with the Department of Experimental Therapeutics, he later moved to the Department of Clinical Pharmacology. During his time at Roswell Park, Dr. Zakrzewski was elevated from the position of Senior Cancer Research Scientist to Associate Research Scientist, and then to the position of Principal Cancer Research Scientist.

7. possible exposure to carcinogens other than radiation;

8. prior exposure to medical radiation;

9. any evidence, other than the victims' disease indicating possibility of exposure to ionizing radiation.[9]

9/15/95 Zakrzewski Rpt. at 2. Further Dr. Zakrzewski notes that because he is not a physician he did not review the test Plaintiffs' medical records. Instead he "relied . . . on the diagnosis of the victims' physicians." *Id.* At the hearing, it was disclosed that the only data upon which Dr. Zakrzewski relied was a "summary sheet" [10] provided to him for each test Plaintiff. (Tr. at 1146, 1167.) Dr. Zakrzewski further testified that the summary sheets were prepared by Plaintiffs' counsel and transmitted to him by Mrs. Aamodt. (6/13/95 Zakrzewski Dep. at 53, 61; Tr. at 1166–67.) Finally, Dr. Zakrzewski noted that he did not formulate a methodology first and then request appropriate data from Plaintiffs' counsel; rather he was provided with data first and then constructed his methodology. (Tr. at 1167.)

**B.** *Discussion*

**1. Qualifications**

■ Plaintiffs offered Dr. Zakrzewski as an expert on risk assessment and environmental toxicology. (Tr. at 1126.) Defendants vigorously contend that Dr. Zakrzewski is not qualified to render an opinion on the medical causation issues in any of the test cases. Most of Defendants' argument centers around Dr. Zakrzewski's lack of for-

mal qualifications in the area of toxicology and risk assessment. Defendants also argue that although Dr. Zakrzewski has almost thirty-seven years of experience in the field of cancer research, "none of [Dr.] Zakrzewski's research experience involved the health effects of radiation or radioactive compounds 'of the sort which we are considering here.'" (Defs.' Findings at 137 (quoting Tr. at 1128, 1124).) Pursuant to the Third Circuit's recent ruling in *Holbrook,* the court finds that Defendants' challenges go to weight rather than admissibility. Although Dr. Zakrzewski does not have specialized expertise regarding the health effects of radiation, he is an experienced cancer researcher who has had some continuing education, albeit a brief education, in the area of toxicology.[11] As such, he meets the threshold requirement for qualification as an expert.

**2. Reliability of the Data**

■ Dr. Zakrzewski's report suffers from a data problem similar to that of Dr. Sterling. Both in his deposition and at the *in limine* hearing, Dr. Zakrzewski testified that all of the information he utilized in forming his causation opinion was contained within the summary sheets provided to him by Mrs. Aamodt.[12] The summary sheets that Dr. Zakrzewski relied upon were admitted during the *in limine* hearings as Defendants' exhibit 181. The summaries are organized with the following headings: personal information, social information, injury claimed, geographical relationship to the accident,[13]

---

**9.** Dr. Zakrzewski testified that with the exception of the leukemia cases he relied "solely on the information [he] . . . had from Dr. Shevchenko with regard to . . . dose." (Tr. at 1187.) Dr. Zakrzewski paid particular attention to damaged tree evidence. However when asked "[s]o at the time that you wrote your report and came to your conclusions that are contained in your report, you didn't have a map showing locations of the trees; you had the information on the summary sheets that told you there were trees in the vicinity][?]" Dr. Zakrzewski replied "You are correct." (Tr. at 1188.)

**10.** The summary sheets were marked as Defendants' exhibit 181 during the *in limine* hearings.

**11.** Dr. Zakrzewski attended a thirty hour summer course in toxicology at the Massachusetts Institute of Technology.

**12.** At his deposition Dr. Zakrzewski indicated that although he had Plaintiffs' medical records in his possession and "looked at them," he did not draw any of his factual knowledge about Plaintiffs from the medical records because he is "not competent to review medical record[s]." 6/13/95 Zakrzewski Dep. at 60, 61 ("Q . . . [D]id you utilize factual information that you discovered in the medical records?" "A No.").

**13.** This section gives the Plaintiff's home and school or work address and notes the distance of each address from TMI. It is also indicates

evidence of exposure to the accident,[14] knowledge of post-accident health of neighbors or schoolmates,[15] other risks prior to diagnosis.[16] No evidence has been placed on the record as to how these summary sheets were created. As such, it is impossible for the court to find with any certainty that the summary sheets are reliable. The issue for the court is whether the reasonable expert, in performing a risk assessment to determine the likelihood that a given individual's cancer was induced by radiation exposure, would base his opinion solely upon the type of data considered by Dr. Zakrzewski. The court finds that he would not.

There are several internationally respected organizations, composed of the most eminent scientists in the field, that have propagated guidelines for conducting risk assessments where there has been a known or potential exposure to ionizing radiation. *See* ICRP No. 60 at 114–53 (detailing these develop-ments); *Whiting*, 891 F.Supp. at 15 ("The most authoritative assessments of the health effects on humans of ionizing radiation are the periodic reports issued by the National Research Council of the National Academy of Sciences Committee on the Biological Effects of Ionizing Radiation (BEIR)."); *Johnston v. United States*, 597 F.Supp. 374, 392 (D.Kan. 1984) (noting that the NCRP and ICRP are organizations that represent the "scientific consensus" on the biological effects of ionizing radiation). Were Dr. Zakrzewski's risk assessment to bear some resemblance to any of these guidelines, it would be proper for the court to admit the proffered testimony and allow challenges regarding the differences in the methodology to be brought out on cross examination. The court is unable to find even an elementary resemblance between Dr. Zakrzewski's methodology and any of the internationally recognized methodologies.[17]

---

whether the Plaintiff evacuated at any time during the accident.

14. This section is comprised of anecdotal evidence. The summary poses the following questions: "Aware of metallic taste or erythema as symptoms of radiation exposure during or after the accident?", and "Aware of accident or danger of accident on the first two days so that they would have looked for symptoms of exposure?" (Defs.' Ex. 181.)

15. This section is also comprised of anecdotal evidence.

16. This section provides information about prior potential radiation exposure only as to some Plaintiffs. As such, Dr. Zakrzewski was unable to consider this factor in his evaluation of certain of the test Plaintiffs (e.g. Villella, Putt). Some of the summary sheets provide precise information regarding the dates, site and type of medical and dental x-rays. Others simply note that the Plaintiff had, for example, "dental x-rays" (e.g. Ward). The following colloquy is illuminating:

Q With regard to factor number 8, prior exposure to medical radiation, you ruled it out as a potential alternative in all cases where you had information, correct?
A I reviewed this dental exposure which was provided to me of some of the plaintiffs where I could calculate the extent of exposure. Some cases were just type of equipment given, so it was impossible for me to calculate it.
Q And when it was impossible for you to calculate it, or when you were not provided with any information regarding prior medi-cal exposures, you did not assess this factor in connection with your methodology here?
A No. I could not.
(Tr. at 1173.)

17. For example, with respect to Plaintiff Ronald Ward, Dr. Zakrzewski testified as follows:

Q In the case of Ronald Ward, am I right that you assumed that since he had osteosarcoma, that he had had an uptake of barium from the accident?
A Yes. That was—that was one of the hypothesis.
Q And is that what you assume with regard to—
A Yes.

Q Did you rely on any particular information regarding barium in the environment after the TMI accident?
A Yes. I relied on two sources. One was the information supplied by Mr. Aamodt. And the second I checked Kasared and Dole's toxicology chapter on radiation, where it has been stated that the cooling water for the reactors contains considerable amounts of barium.

Q Doctor, my question is: Did you have environmental sampling data from the TMI environment indicating that there was barium in the environment, or any daughter products?
A No.
(Tr. at 1180–82.) The court notes that reactor coolant water contains *boron*. Thus, based upon Mr. Aamodt's "information" claiming that barium was released during the TMI accident, Dr. Zakrzewski concluded that Plaintiff Ward's os-

Dr. Zakrzewski used only a fraction of the data that any of these international committees point to as being essential. As such, the court is unable to find that Dr. Zakrzewski's study is based upon "good grounds."[18] During the hearings, Dr. Zakrzewski testified as to the basis of his opinion for each of the test Plaintiffs. His testimony further demonstrates the dramatic difference between Dr. Zakrzewski's risk assessment and a more traditional risk assessment. The following is an excerpt of the testimony heard by the court:

Q In the case of Joseph Gaughan, you assumed that he was exposed to radiation from TMI because he got sick and there were damaged trees in his neighborhood; is that the basis of your assumption?

A Yes, ma'am.

Q And in the case of Lori Dolan, you assumed that she was exposed to radiation from TMI on the basis of damaged trees in her area, correct?

A Yes.

Q In the case of Jolene Peterson, you assumed that she was exposed to radiation from TMI on the basis that her mother reported a metallic taste, that her mother had erythema, and that there were damaged trees somewhere near her; is that correct?

A That's correct.

. . . . .

Q When you wrote the report, did you study specifically where the damaged trees were in relation to Jolene Peterson's work or home address?

A No.

(Tr. at 1182–83.)

Because the study is not based upon reliable data or good grounds, the court finds the study to be scientifically unreliable. The court will exclude the proffered testimony of Dr. Zakrzewski as scientifically unreliable.

## IV. *David Lochbaum*

Prior to this court issuing its ruling related to the first round of *in limine* hearings on January 5, 1996, Plaintiffs' expert Richard Webb recanted a significant portion of his proffered testimony. Due to the recantation and the court's determination that Richard Webb's proffered testimony was scientifically unreliable, the court excluded the testimony. Richard Webb was Plaintiffs' only expert prepared to testify as to the pathways for release and quantities of radioactive noble gases released from TMI during the accident. Because the court recognized that such testimony was important to Plaintiffs' case, the court permitted Plaintiffs to find an expert to testify in Dr. Webb's place. On January 22, 1996, Plaintiffs submitted the report of David Lochbaum.[19] Mr. Lochbaum has a bachelor's degree in nuclear engineering and approximately seventeen years experience in the nuclear industry. (Tr. at 1409.) His experience in the nuclear industry has been primarily with boiling water reactors.[20] (Tr. at 1411.)

---

teosarcoma was caused by his exposure during the TMI accident. Initially, Dr. Zakrzewski attributed Plaintiff Ward's cancer to the release of radon during the accident. When Dr. Zakrzewski learned that no radon was released, he altered his opinion to make barium the causative agent. That Dr. Zakrzewski changed his opinion is only somewhat problematic. More troubling to the court in the context of the reliability analysis, is that Dr. Zakrzewski would attribute the cancer to exposure to radon during the TMI accident without knowing whether radon was even released during the accident.

**18.** Defendants also challenge Dr. Zakrzewski's use and understanding of the concept of latency periods. Defendants argue that the latency periods assumed by Dr. Zakrzewski are significantly lower than the latency periods recognized by the literature. Because the court will find Dr. Zakrzewski's testimony to be inadmissible on other grounds, it will not reach the merits of Defendants' latency period argument.

**19.** Prior to the first round of *in limine* hearings, David Lochbaum had submitted a report detailing his opinion that the Webb source term analysis was scientifically valid. The court excluded the report, without reaching the merits of a *Daubert/Paoli II* analysis, because following the Webb recantation, David Lochbaum's report did not have the requisite Rule 702 "fit" with the litigation.

**20.** The TMI–2 reactor is a pressurized water reactor, nevertheless, the court finds Mr. Lochbaum's broad experience to qualify him to testify as an expert.

■■■■ Plaintiffs contend that David Lochbaum will testify that "significantly more than 10 million curies of noble gases reached the environment as a result of the TMI–II accident." (Pls.' Findings at 32.) [21] Mr. Lochbaum reaches this conclusion based upon his analysis of potential pathways of release through the TMI–2 reactor and connected buildings. According to Mr. Lochbaum, "the purpose of [his] ... evaluation was to examine the role of the letdown line in the release of noble gases to the environment. The sustained use of the letdown line enabled radioactive noble gases to be removed from the reactor coolant system and containment into equipment within the auxiliary building. Noble gases were released from the auxiliary building equipment, which was not designed to retain significant volumes of highly radioactive gases." (1/22/96 Lochbaum Rpt. at 1.)

At the *in limine* hearing, Mr. Lochbaum testified that after his review of the pertinent data he found that he did "not believe that there was evidence of a blowout." (Tr. at 1455.) He proceeded to testify as follows:

> [I]f a blowout occurred, its duration was of limited length. It would have been on the order of minutes as opposed to the entire two- or three-hour duration of the third window,[22] for example. A short duration blowout would still have been significant because of the high gas concentrated transport that would have occurred.

(Tr. at 1455–56 (footnote added).) Thus, the court views Mr. Lochbaum's testimony as being dependent upon other of Plaintiffs' experts conclusively demonstrating that significant releases of radiation in fact occurred. More specifically, standing alone, the court finds that Mr. Lochbaum's testimony would not assist the trier of fact in reaching any conclusion as to any issue in the case. If, however, Plaintiffs present other evidence that substantiates their position that a large release occurred, his theories as to how the gases left the TMI–2 reactor and entered the environment would be helpful. At this stage in the proceeding, it would be improper for the court to rule upon the sufficiency of Plaintiffs' evidence. As such, the court will admit the proffered testimony of Mr. Lochbaum subject to a later connection with substantiated dose evidence.[23] Fed.R.Evid. 104(b). Should Plaintiffs be unable to "connect up" Mr. Lochbaum's testimony, it will be excluded as lacking the requisite Rule 702 "fit," and as being unhelpful to the trier of fact.

## V. *Dr. Joseph P. Cardinale*

■■■■ Dr. Cardinale is the treating physician of Plaintiff Lori Dolan. Although he was identified as an expert witness, he has not produced a report in connection with the instant litigation. Due to scheduling constraints, the court was unable to hear Dr. Cardinale's testimony at the *in limine* hearing. As such, the court permitted the parties to submit depositions in lieu of hearing testimony. At the deposition, Defendants made the following objection for the record:

> Today is March 6, 1996. Plaintiff's expert reports with respect to any experts they intended to offer on the issues of dose or medical causation were due on March 1, 1995, more than a year ago.
>
> There has been no written report furnished to us with respect to this witness. We have no information as to the opinions

---

**21.** Defendants' challenge Mr. Lochbaum's testimony, to the extent it may be offered on rebuttal, on the grounds that the testimony is based upon a misunderstanding of the source terms used by Defense experts Akers and Daniel, and because it "proceeds from a misunderstanding of the two different kinds of analyses Daniel and Akers presented in their reports." (Defs.' Findings at 28–29.) The court finds Defendants' arguments to go to weight rather than admissibility. Accordingly, the court will not reach the merits of these arguments.

**22.** In his report Mr. Lochbaum concludes that "[t]he four prerequisites for a potential 'blowout' through the letdown line may have been satisfied on three occasions during the first day of the TMI–2 accident." (1/22/96 Lochbaum Rpt. at 8.)

**23.** The court notes that Defendants have not challenged the scientific reliability of Mr. Lochbaum's methodology. Instead, their challenge is based upon their belief that the testimony does not have the requisite Rule 702 fit with the instant litigation. Because Defendants have not challenged the reliability of the report, and because the court's independent *Daubert/Paoli II* analysis has revealed that the report is scientifically reliable, the court will not further address this issue in this memorandum of law.

he is expected to offer, the bases for those opinions, the facts and data on which he relies or any of the other information required by Rule 26 and the Practice Orders of the Court.

(3/6/96 Cardinale Dep. at 3.) The court will sustain Defendants' objection in part. Pursuant to the discussion in § I of this court's April 2, 1996 memorandum of law, the instant Rule 26 violation will be addressed in the context of the court's separate order to show cause why monetary sanctions should not be imposed upon certain of Plaintiffs' counsel pursuant to Rule 37 of the Federal Rules of Civil Procedure. The court will, however, admit the testimony of Dr. Cardinale for the purpose of determining whether it is scientifically reliable and based upon "good grounds." To the extent that the court finds Dr. Cardinale's testimony admissible, the court will strictly limit his testimony to that information which was expressly questioned upon and revealed during his deposition.

**A.** *The Proffered Testimony*

■ According to his deposition, it appears that Dr. Cardinale will testify that he is "85 percent certain" that Plaintiff Lori Dolan's thyroid cancer was induced by her exposure to ionizing radiation during the TMI accident. (3/6/96 Cardinale Dep. at 23–26.) Based upon his deposition testimony, it appears that Dr. Cardinale obtained all of his information regarding evidence of exposure from Mr. Aamodt.[24] Although not an exhaustive listing of the testimony related to his reliance on evidence provided by Mr. Aamodt, the following portions of Dr. Cardinale's testimony are illustrative:

Q Were you supplied with any reports of witnesses?

A Yes.

Q What expert report were you supplied with?

A The main spokesman for the defendant was in charge—I forgot his name who made statements. I can look that up.

Q Would you, please. It's important.

A Okay. And then they brought a physicist over who talked to me and gave me information about different tests that they had run.

Q What was his name?

A He's from upstate New York. I can't remember his name.

Q Was his name Norman Aamodt?

A Yes.

. . . . .

Q And what did Mr. Aamodt say that Shevchenko ... said?

A That—one thing that stood in my mind was that there was a certain type of a pine tree that was—in Chernobyl it was stunted because of a certain exposure to radiation, and a similar pine tree in the path of the balloon plume from the Three Mile Island shows a stunting of the same trees. And he also reviewed studies of trees in the Three Mile Island area that shows certain gases, noble gases, that have high radiation indications to them.

(3/6/96 Cardinale Dep. at 32–33.)

. . . . .

Q Did you do any analysis to arrive at your own estimate of what dose Lori Dolan might have received to her thyroid as a consequence of anything that happened in the TMI accident?

A No.

(3/6/96 Cardinale Dep. at 40.)

■ As has been noted in other sections of the instant memorandum of law, a differential diagnosis which involves the physical examination of a patient or a review of pertinent medical records, is generally scientifically reliable as a matter of law. *Paoli II*, 35 F.3d at 758. As Lori Dolan's treating physician, Dr. Cardinale is in the position to make a reliable differential diagnosis. The court is, however troubled by the information relied upon by Dr. Cardinale. From his deposition testimony it appears that a majority of Dr. Cardinale's information regarding the amount of radiation to which the TMI

---

**24.** The same concerns regarding the Aamodts which have been expressed in the court's discus-sion of Dr. Sterling and Dr. Zakrzewski apply here.

population was exposed to during the accident was drawn from a one hour discussion with Mr. Aamodt. The court has already noted that Mr. Aamodt has not been identified as an expert in this case. To the extent that Dr. Cardinale based his opinion solely upon his discussion with Mr. Aamodt, his opinion is unreliable. The indicia of trustworthiness inherent in a scientifically reliable report or study is removed where one's only knowledge of the reliable report is derived from an abstracted presentation of that report presented by a "consultant" to an interested party in the litigation.

 During the deposition, Dr. Cardinale further explained the basis of his opinion as follows:

> I'm saying that the gases, the different types of radiation she was exposed to I understand was more than one. I don't know whether one gas absorbed through the lungs by breathing and another gas absorbed through the skin, whether that same hundred rads is equal to a dosage of a target of 6.5 to the thyroid. I don't know. *That's were your experts will have to give an answer to that effect.*
>
> As a clinician with what I have available, I am concerned that this did cause her cancer.

(3/6/96 Cardinale Dep. at 64 (emphasis added).) As Lori Dolan's treating physician, Dr. Cardinale is qualified to give an opinion as to what he believes to have been the cause of her cancer, to the extent that the evidence before him is capable of supporting such a finding. The court understands Dr. Cardinale to claim that presuming the dose of radiation to Lori Dolan was equivalent to a target dose of 6.5 rads to the thyroid, he is 85 percent certain that her cancer was induced by that exposure to radiation. Accordingly, insofar as Plaintiffs, through other admissible evidence, can prove that Lori Dolan did receive a dose equivalent to a target dose of 6.5 rads to the thyroid, Dr. Cardinale's proffered testimony will be admitted. Fed.R.Evid. 104(b).

### VI. *Conclusion*

Based upon the foregoing, the court will deny Defendants' motion *in limine* and admit the proffered testimony of Dr. Winters, Dr. Cardinale, Dr. Galindo[25] and David Lochbaum. The court will grant Defendants' motion *in limine* and exclude the proffered testimony of Dr. Sterling and Dr. Zakrzewski. The court notes that where it has so indicated in the body of this memorandum of law, the admissibility of Plaintiffs' medical causation experts is subject to their testimony being connected with dose testimony which establishes the dose levels that they presumed in reaching their conclusions. An appropriate order will be issued.

### *ORDER*

In accordance with the accompanying memorandum of law, **IT IS HEREBY ORDERED THAT:**

1) Defendants' motion *in limine* to exclude Plaintiffs' medical causation experts is **GRANTED** as to the proffered testimony of Dr. Theodor Sterling and Dr. Sigmund Zackrzewski;

2) Defendants' motion *in limine* to exclude Plaintiffs' medical causation experts is **DENIED** as to the proffered testimony of Dr. Winters, Dr. Cardinale, Dr. Galindo, and David Lochbaum, to the extent that each of their testimony is eventually connected with appropriate dose testimony pursuant to Rule 104(b) of the Federal Rules of Evidence.

---

**25.** The court's rationale for admitting Dr. Galindo is similar to its rationale for admitting Dr. Cardinale. A brief memorandum of law with respect to Dr. Galindo will be issued April 8 or 9.