**Vicky MORIN, Plaintiff,**

v.

**UNITED STATES OF AMERICA and Does, I–X, inclusive, Defendants.**

**No. CV–N–03–0503–HDMRAM.**

United States District Court, D. Nevada.

July 15, 2005.

Alan S. Levin, Law office of Alan S. Levin, Incline Village, NV, for plaintiff.

Adam Bain, U.S. DOJ - Civil Div., Washington, DC, Gregory W. Addington, U.S. Attorney's Office, Reno, NV, for defendants.

HOWARD D. MCKIBBEN, District Judge.

Plaintiff Vicky Morin ("plaintiff") filed this action against the United States alleging that exposure to jet fuel caused her to develop a malignant plasmacytoma of the brain. This case is currently before this court on cross-motions for summary judgment. (*See* (# 38, 40)). Defendant, the United States, argues that it is entitled to summary judgment because the suit is untimely under the Federal Tort Claims Act and because plaintiff has failed to establish a causal link between jet fuel and cancer in regard to her negligence claim. (*See* (# 38)). Plaintiff argues that she is enti-

tled to summary judgment on the issues of general and specific causation because she has established a causal link between the jet fuel and the cancer. (*See* (# 40)). Because plaintiff has failed to establish a causal link between jet fuel and cancer, and because causation is a necessary element of plaintiff's negligence claim, defendant's motion for summary judgment is granted.

## I. Background

Plaintiff was employed by the Allen Corporation from 1982 to 1986. During her time with the company she worked in a building located at the end of an active runway at the U.S. Naval Air Station in Fallon, Nevada ("NAS Fallon"). Plaintiff alleges that she was "literally bathed in jet fuel routinely dumped by Navy jet aircraft on their approach to landing." (*See* (# 2) at ¶ 6). Plaintiff contends that she was exposed to constant fumes in the air from the jet fuel. (*See* (# 40) Ex. 3 at 3). Throughout her period of employment with the Allen Corporation, plaintiff experienced skin irritations, blisters, and was sick all the time. (*See* (# 40) Ex. 4 at 102–05). In her deposition, plaintiff testified that she believed that exposure to the jet fuel caused her health problems. (*See id.*).

Plaintiff also claims that between 1978 and 1980, her home was situated right under the flight path for planes taking off and landing at the NAS Fallon and that her home was "daily bathed" with jet fuel. (*See id.*). Similarly, plaintiff maintains that in 1981 she moved to a ranch that was on the flight path for two bombing ranges and during this period her home was regularly bathed in ported jet fuel. (*See id.*).

Around January 2000, plaintiff began experiencing blurred vision, disorientation, and discovered a "soft spot" on her temple. (*See* (# 40) at 157–60). Over the next several months, the soft spot continued to grow and, in July and August 2000, one of

plaintiff's eyes started bulging out. (*See id.* at 158–60).[1]

In November 2000, plaintiff went to see her primary care physician, Dr. Ridenour. On November 22, 2000, Dr. Ridenour requested a brain scan because of the swelling she was experiencing around her eye. (*See* (# 40)). The scan revealed a large mass in the orbital area. Dr. Ridenour told plaintiff that she had a tumor that was probably a meningioma, a tumor of the membranes enclosing the brain. (*See* (# 40) Ex. 4 at 259–60).

On November 29, 2000, plaintiff consulted with a neurosurgeon, Dr. Joseph Walker. (*See* (# 40) Ex. 5). Plaintiff told Dr. Walker that, about fifteen months earlier, she had first noticed that skin on her head sounded like leather when she scratched it. After reviewing the MRI and CT, Dr. Walker confirmed that plaintiff had a brain tumor. On February 23, 2001, plaintiff underwent surgery to remove the tumor. After the surgery, the tumor was identified as a malignant plasmacytoma rather than a meningioma.

On February 27, 2003, plaintiff presented an administrative claim to the United States Navy, (*see* (# 40) Ex. 7), alleging that exposure to jet fuel caused her tumor. On September 16, 2003, after six months of non-action, plaintiff filed the present suit against the United States.

## II. Standard of Review

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). The burden of demonstrating the absence of a genuine issue of material fact lies with the moving party, and for this purpose, the material lodged by the moving party must be viewed in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1378 (9th Cir. 1998). A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the differing versions of the truth. *Lynn v. Sheet Metal Workers' Int'l Ass'n,* 804 F.2d 1472, 1483 (9th Cir.1986); *S.E.C. v. Seaboard Corp.,* 677 F.2d 1301, 1306 (9th Cir.1982). If the parties file cross-motions for summary judgment, the court must consider each party's motion separately and determine whether that party is entitled to a judgment under Rule 56. In making these determinations, the court must evaluate the evidence offered in support of each cross-motion. *Fair Housing Council of Riverside County, Inc. v. Riverside Two,* 249 F.3d 1132, 1136–37 (9th Cir.2001).

 Once the moving party presents evidence that would call for judgment as a matter of law at trial if left uncontroverted, the respondent must show by specific facts the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Id.* at 249–50, 106 S.Ct. 2505 (citations omitted). "A mere scintilla of evidence will not do, for a jury is per-

---

1. During the summer of 2000, news regarding the leukemia cluster in Fallon became widespread. Plaintiff conducted her own internet research during this time and found several sites which attributed certain cancers to exposure to benzene. Plaintiff began developing a website about the leukemia cluster and its potential relationship to benzene.

mitted to draw only those inferences of which the evidence is reasonably susceptible; it may not resort to speculation." *British Airways Board v. Boeing Co.*, 585 F.2d 946, 952 (9th Cir.1978); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("[I]n the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to allow a reasonable juror to conclude that the position more likely than not is true, the court remains free … to grant summary judgment."). Moreover, "[i]f the factual context makes the nonmoving party's claim of a disputed fact implausible, then that party must come forward with more persuasive evidence than otherwise would be necessary to show there is a genuine issue for trial." *Blue Ridge Insurance Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir.1998) (citing *Cal. Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir.1987)). Conclusory allegations that are unsupported by factual data cannot defeat a motion for summary judgment. *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.1989).

Finally, if the nonmoving party fails to present an adequate opposition to a summary judgment motion, the court need not search the entire record for evidence that demonstrates the existence of a genuine issue of fact. *See Carmen v. San Francisco Unified Sch. Dist.*, 237 F.3d 1026, 1029–31 (9th Cir.2001) (holding that "the district court may determine whether there is a genuine issue of fact, on summary judgment, based on the papers submitted on the motion and such other papers as may be on file and specifically referred to and facts therein set forth in the motion papers"). The district court need not "scour the record in search of a genuine issue of triable fact," but rather must "rely on the nonmoving party to identify with reasonable particularity the evidence that pre-

cludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir.1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir.1995)). "[The nonmoving party's] burden to respond is really an opportunity to assist the court in understanding the facts. But if the nonmoving party fails to discharge that burden-for example by remaining silent-its opportunity is waived and its case wagered." *Guarino v. Brookfield Township Trustees*, 980 F.2d 399, 405 (6th Cir.1992).

### III. Statute of Limitations under the FTCA

Plaintiff filed her administrative claim with the United States Navy on February 27, 2003. (*See* (# 40) Ex. 7). The United States argues that it is entitled to summary judgment because plaintiff was aware of the information on which she based her claims more than two years prior to February 27, 2003. (*See* (# 40) at 9).

■ The Federal Tort Claims Act requires that a claim against the United States must be submitted to the appropriate federal agency "within two years after such claim accrues." 28 U.S.C. § 2401(b); *Herrera–Diaz v. United States Dept. of Navy*, 845 F.2d 1534, 1536 (9th Cir.1988). In cases involving latent diseases, medical malpractice, and wrongful death, the Ninth Circuit has applied a "discovery rule" to the accrual of 28 U.S.C. § 2401(b). *See Winter v. U.S.*, 244 F.3d 1088, 1090 (9th Cir.2001); *Rosales v. United States*, 824 F.2d 799, 805 (9th Cir.1987). Thus, a claim accrues when the "plaintiff has discovered, or in the exercise of reasonable diligence should have discovered, both its injury and its cause." *Davis v. United States*, 642 F.2d 328, 331 (9th Cir.1981).

It is undisputed that plaintiff knew that she had a brain tumor prior to February 27, 2001. (*See* (# 40) Ex. 5–6) (Dr. Walker's diagnosis of a tumor on November 29,

2000). Additionally, in January 2000, plaintiff told her son that she knew that she had a brain tumor. (*See* (# 40) Ex. 4 at 157). However, conflicting evidence exists as to whether plaintiff knew or reasonably should have known the cause of her injury.

Plaintiff argues that she could not have possibly known that her cancer was caused by jet fuel prior to her surgery, on February 23, 2001, because of the nature of the tumor. Plaintiff admits that she is a heavy smoker and was smoking as much as three packs a day during the relevant time period. When she was diagnosed with a meningioma a reasonable inference could be drawn that she and her doctors would have attributed the tumor to her chronic smoking. (*See* (# 40) Ex. 4 at 259–60). When the tumor was removed on February 27, 2001 it was found to be a malignant plasmacytoma, a type of cancer not generally associated with smoking. Conversely, factual evidence exists to show that plaintiff had all the information on which she based her claim that exposure to jet fuel caused her ailment before that date. Plaintiff testified that throughout her period of employment with the Allen Corporation, she experienced skin irritations, blisters, and was sick all the time. (*See* (# 40) Ex. 4 at 102–05). Moreover, she testified that she believed that her exposure to the jet fuel caused these ailments. (*See id.*). Additionally, plaintiff was acutely aware of the widespread coverage of the Fallon leukemia clusters having created a website that dealt with benzene, leukemia, and the cluster, and she discussed the possible link between benzene and myelomas with her treating physician. (*See id.* at 170–71).

The conflicting evidence on when plaintiff reasonably should have know the cause of her injury creates a general issue of material fact that ultimately must be determined by the trier of fact prior to the court deciding whether this action is time-barred. Accordingly, summary judgment is inappropriate as to the statute of limitations defense.

### IV. Causation

Plaintiff has sued the United States alleging that the negligent dumping of jet fuel at NAS Fallon caused plaintiff's brain tumor. The only evidence proffered to establish general and specific causation is the plaintiff's untimely filed expert report, from her treating physician, Dr. Ridenour. (See (# 40) Ex. 12). The United States argues that Dr. Ridenour's report should be excluded for two reasons. First, Dr. Ridenour's report is unreliable and inadmissible under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Second, plaintiff failed to disclose Dr. Ridenour's report by the July 19, 2004, the deadline for disclosing expert witnesses. Plaintiff has filed her own motion for summary judgment (# 38) on the issues of general and specific causation. Plaintiff argues that there is no dispute that jet fuel can cause a malignant plasmacytoma and she is entitled to judgment as a matter of law.

### A. Admissibility of Dr. Ridenour's Report

In admitting expert testimony, Federal Rule of Evidence 702 requires that two preliminary determinations be made by the trial court. First, the proffered witness be qualified as an expert by reason of his or her knowledge, skill, experience, training, or education. *See* Fed.R.Evid. 702. Second, the proffered expert's opinion must be based on scientific, technical, or other specialized knowledge, that will assist the trier of fact to understand the evidence or determine a fact in issue. *Id.*

#### 1. Qualifications

The question of whether the witness is sufficiently qualified as an expert is a mat-

ter to be decided by the court. *See* Fed. R.Evid. 702, *see also* Fed.R.Evid. 104(a). In assessing whether an expert has the appropriate qualifications, the court considers whether the expert offers some special knowledge, skill, experience, training, or education on the subject matter. Fed. R.Evid. 702; *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.2000). If an individual is not qualified to render an opinion on a particular question or subject, it follows that his opinion cannot assist the trier of fact with regard to that particular question or subject. *See Whiting v. Boston Edison Co.*, 891 F.Supp. 12, 24 (D.Mass. 1995) ("Just as a lawyer is not by general education and experience qualified to give an expert opinion on every subject of the law, so too a scientist or medical doctor is not presumed to have expert knowledge about every conceivable scientific principle or disease").

■ Plaintiff's proffered expert is Gary C. Ridenour M.D., plaintiff's treating physician. (See (# 40) Ex. 12). Dr. Ridenour is a licensed physician who has practiced in Fallon, Nevada for over 20 years. (*Id.*). He has diagnosed and treated over a thousand patients for cancer, at least fifty of whom had multiple myeloma. (*Id.*). He has knowledge of the plaintiff's health for almost 20 years and was the first to diagnose her with a brain tumor which proved to be a malignant plasmacytoma. (*Id.*).

This court is cognizant that the resolution of the causation issue in many cases turns on the testimony of treating physicians. *See Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1496 (D.Kan.1990), aff'd in part, 948 F.2d 1546 (10th Cir.1991), *cert. denied*, 504 U.S. 910, 112 S.Ct. 1941, 118 L.Ed.2d 547 (1992); *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1384 (4th Cir. 1995) (permitting treating physician to render an opinion that combining alcohol with therapeutic doses of acetaminophen caused liver disease in light of "medical community's daily use of the same methodologies in diagnosing patients"). However, as many courts have found, certain issues of causation "do not lend themselves to the same certainties as do diseases such as asbestosis, whose cause is readily attributable to a particular agent or class of agents." *Mason*, 741 F.Supp. at 1497 ("A medical degree or training does not confer any magical qualities upon those experts for both plaintiff and defendant who testified on the causation issue."); *Sutera v. Perrier Group of America Inc.* 986 F.Supp. 655, 667 (D.Mass.1997) (treating physician was oncologist and hematologist but lacked expertise to testify as to causal link between benzene and leukemia). This is such a case. Without scientifically reliable evidence, plaintiff cannot show a causal connection between jet fuel and a malignant plasmacytoma sufficient to submit this case to the trier of fact.

Dr. Ridenour has no expertise in toxicology, epidemiology, risk-assessment, or environmental medicine. Although he is a physician with expertise in diagnosing and treating cancer, the ability to diagnose and to treat a disease is substantially different from the expertise required to assess its genesis to a reasonable degree of scientific certainty. *Id.* at 667. Moreover, Dr. Ridenour has not done any original research or published any papers about jet fuel or its potential cancerous effects. Dr. Ridenour may very well be qualified as an expert with regard to the general practice of medicine and the ability to diagnose and treat cancer. But this court must assess whether he is qualified to testify as to the causal link between jet fuel and cancer. Based upon his report, his qualifications, and experience, this court finds that Dr. Ridenour has failed to establish sufficient expertise as to that particular question. Nevertheless, this court will assess his report to determine its admissibility under Rule 702 and Daubert.

### 2. Dr. Ridenour's Report

Plaintiff has introduced Dr. Ridenour's report to establish generally that jet fuel can cause a malignant plasmacytoma and to establish specifically that the jet fuel at NAS Fallon caused plaintiff's cancer. The following is the complete text of Dr. Ridenour's report.

### Summary of My Assignment and Opinions

I have been asked to consider whether the exposure to jet fuel exhausts have caused Mrs. Vicky Morin's malignant plasmacytoma. My answer is yes. I base my opinion on my training, education, experience, the medical record, my care and treatment of Mrs. Morin and my own personal experience with Mrs. Morin's job and the Naval Air Station (NAS) Fallon and its aircraft. I have also read the Report of John Whysner, MD, PhD, DABT, and Samuel J. Scott, MD MPH, FACOEM written for the defense in this case. I have been asked to briefly comment on the shortcomings of that report.

### My Qualifications, Training and Experience

I am currently licensed physician practicing medicine in Fallon, Nevada for over 20 years. I have diagnosed and treated over 1000 cancers in my own personal patients. At least 50 of these were multiple myeloma. I have followed Mrs. Morin for over 20 years and it was I who initially diagnosed her brain tumor which proved to be a malignant plasmacytoma. Please see my attached curriculum vita.

### The Whysner Scott Report

I have reviewed the Whysner Scott Report and find that I disagree with their conclusions on the carcinogenity of raw, unburned fuel. Unburned motor fuels of all types have been linked to various cancers including multiple myeloma.[1] In addition, the doctors completely ignore the fact that Mrs. Morin was also exposed to large amounts of jet engine exhaust from the Naval Aircraft operating at NAS Fallon. I can attest to this fact since I saw her on several occasions when she came to my office from her workplace at NAS Fallon. Her clothes were damp and literally reeking of the stench of jet exhaust.

It is well accepted that engine exhausts are a known cause multiple myeloma.[2] The defense experts in their own reports admit that tractor engine exhausts are associated with multiple myeloma.[3] Tractors born both kerosene (jet fuel) and diesel which is closely related chemically to jet fuel.[4]

### Conclusion

It is my opinion; to a reasonable degree of medical certainty that Mrs. Morin's malignant plasmacytoma was caused by her exposure to jet fuel exhaust emanating from jet aircraft operating at NAS Fallon.

### Compensation and Testimony in last 4 years

I have been paid $3,000 for this report. My hourly fee for testimony as a medical expert in depositions and court testimony is $500.00 per hour. I have testified in several medical malpractice cases in last 4 years.

fn1 Studies have shown an increased prevalence in patients who have been exposed to fuel oil products, agricultural workers, miners, and sheet metal workers. http://www.21stcentury oncology.com/cancer/cancer_specific_ myeloma.html

fn2 Shewit Bezabeh, Arnold Engel, Carolyn B. Morris, and Steven H. Lamm Does Benzene Cause Multiple

Myeloma? An Analysis of the Published Case–Control Literature Environmental Health Perspectives, Volume 104, Supplement 6, December 1996

fn3 Whysner/Scott report July 16, 2004 p.21 ¶ 2.

fn4 Kerosene—fuel for jet engines and tractors; starting material for making other products liquid is a mix of alkanes (10 to 18 carbons) and aromatics with a boiling range of 175 to 325 degrees Celsius. Diesel fuel is a mix of alkanes (12 or more carbon atoms) with a boiling range of 250 to 350 degrees Celsius.

### 3. Daubert and Fed.R.Evid. 702

The Supreme Court's decision in *Daubert* established the duty of a trial judge, under Fed.R.Evid. 702, to play the role of a gatekeeper, insuring that the fact-finding process does not become distorted by what is popularly called junk science. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508; *see also Kennedy v. Collagen Corp.,* 161 F.3d 1226, 1229–30 (9th Cir.1998); *Whiting v. Boston Edison Co.,* 891 F.Supp. 12, 24 (D.Mass. 1995). This role is especially sensitive in cases where the plaintiff claims that exposure to a toxic substance caused her injury, because a jury may accept an expert's opinion that conforms with their underlying fears of toxic substances without carefully understanding or examining the basis for that opinion. *See id.*

■ Under *Daubert,* the trial court performs its gatekeeping function by determining if the proffered evidence is both relevant and reliable. *Daubert,* 509 U.S. at 589–95, 113 S.Ct. 2786. Scientific evidence is deemed reliable if the principles and methodology used by the expert proffering it are grounded in the methods of science. *Id.* at 592–95, 113 S.Ct. 2786. In *Daubert,* the Supreme Court gave a non-

exhaustive list of factors for determining whether scientific testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the theory or methodology can be, and has been tested (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error, (4) the existence and maintenance of standards controlling the methodology's operation and, finally, (5) general acceptance in the relevant community. *Id.* at 593–94, 113 S.Ct. 2786. Additionally, if an expert does not conduct his or her own research, independent of the litigation, on the subject of the testimony, the district court must determine "whether there exists any objective, verifiable evidence that the testimony is based on scientifically valid principles." *Domingo ex rel. Domingo v. T.K.,* 289 F.3d 600, 605 (9th Cir.2002)(internal citations omitted) (quoting *Daubert v. Merrell Dow Pharms., Inc.,* 43 F.3d 1311, 1317–18 (9th Cir.1995) ("*Daubert II*")).

■ Experts may demonstrate the scientific validity of a theory or technique by showing that "the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Daubert II,* 43 F.3d at 1318. Alternatively, testifying experts may also show the validity of their theory by explaining "precisely how [the experts] went about reaching their conclusions and point[ing] to some objective source—a learned treatise, the policy statement of a professional association, a published article in a reputable scientific journal or the like—to show that they have followed the scientific method, as it is practiced by (at least) a recognized minority of scientists in their field." *Id.* at 1319.

■ Dr. Ridenour's opinions, as expressed in his report, do not meet the necessary standard for reliability under Daubert. The *Daubert* factors refer to the

"theory or technique" that is the basis for the expert's scientific evidence and expert opinion. Dr. Ridenour's report contains no mention of a specific scientific theory or technique used in reaching his conclusions, nor is there any reference to a body of scientific knowledge or principles that was drawn upon in the evaluation. Because the theory or technique used is unknown, there is no proof that Dr. Ridenour's methods of evaluation have been or even can be tested.[2] There is no evidence of peer review or publication, of the error rate for the particular scientific technique used, or the level of acceptance for the theory or technique in the scientific community.

In applying the *Daubert* factors, pursuant to Fed.R.Evid. 702, Dr. Ridenour's report must be excluded because (1) Dr. Ridenour's opinion is not supported by reliable scientific evidence; (2) his opinion failed to follow an appropriate methodology to determine general or specific causation and (3) Dr. Ridenour is not qualified to render an expert report regarding whether exposure to jet fuel caused plaintiff's tumor.

Dr. Ridenour's report is an attempt to establish causation without employing an appropriate methodology and without providing reliable scientific evidence that supports his conclusion. The website that Dr. Ridenour cites for his proposition that unburned motor fuels of all types have been linked to various cancers including multiple myeloma, is not peer reviewed and does not support his position. The website states "[s]tudies have shown an increased prevalence in patients who have been exposed to fuel oil products, agricultural workers, miners and sheet metal workers. The specific etiologic factors regarding multiple myeloma are unknown."[3] The article that Dr. Ridenour cites to support his position that engine exhausts are a known cause of multiple myeloma concludes that "causes of multiple myeloma are not clear" and that "causal agents for multiple myeloma have not been found." (*See* (# 20) Ex. 15).

Dr. Ridenour's reliance on the Whysner/Scott report to support his third assertion is misplaced.[4] In relevant part, the

---

**2.** Plaintiff's attorney, Dr. Levin, claims that Dr. Ridenour used "differential diagnosis" as the foundation for his expert opinion. (*See* (# 46) at 6–7). This court appreciates that plaintiff's attorney is a licensed physician, but Dr. Levin cannot offer testimony in an attempt to bolster Dr. Ridenour's report. Rather as an expert, Dr. Ridenour's report must speak for itself. However, the report fails to even mention the use of differential diagnosis and his report does not illustrate that he followed that methodology. Once general causation is established, an expert utilizes a differential diagnosis procedure to eliminate the other most likely causes of a condition. *See In re Breast Implant Litigation*, 11 F.Supp.2d 1217, 1229 (D.Colo.1998). In the present instance, if Dr. Ridenour had established generally that jet fuel can cause a malignant plasmacytoma, using the differential diagnosis procedure he needed to attempt to eliminate all other causes of plaintiff's condition. Dr. Ridenour's report does not even mention other potential causes that may have affected

plaintiff, non how he was able to eliminate them from being the cause of plaintiff's tumor. Dr. Ridenour's report makes no mention of any such potential alternative factor, causes, including medical history, environmental, etc., even in an attempt to eliminate them under the differential diagnosis method. While plasmacytoma is a blood-related cancer and is not typically associated with smoking, Dr. Ridenour's report makes no mention of plaintiff's smoking habit which consisted of 3 packs a day. The report instead simply offers a conclusory statement unsupported by any methodology.

**3.** http://www.21stcenturyoncology.com/cancer/cancer_specific_myeloma1.html

**4.** Plaintiff takes a twofold approach to the experts' report of defendant. First, plaintiff cites the Whysner/Scott report for the proposition that jet motor exhaust causes plasmacytoma. (*See* (# 38) at 4). As discussed, this court rejects that assertion. Second, plaintiff

report states that the "majority of epidemiological studies which have evaluated the risk of myeloma among agricultural workers have reported positive associations .... Various studies have linked these elevated risks to an array of exposures including grain dusts, certain farm animals, pesticides, and tractor engine exhausts." This statement is insufficient to support the conclusion that jet fuel caused plaintiff's cancer. Rather this statement shows that the most consistent association of multiple myeloma with occupations has been agricultural workers *but* the actual causative agent has not been identified. Finally, Dr. Ridenour makes a statement about kerosene and diesel being closely related chemically to jet fuel, but provides no evidence or peer reviewed article to support this conclusion.

In sum, Dr. Ridenour's report is precisely the kind of subjective testimony that is inadmissible pursuant to Rule 702 and as clarified by *Daubert* and its progeny.

### 4. Timeliness of Expert Disclosure

Even though this court has already found that the Dr. Ridenour's report is inadmissible under Rule 702, this court will consider defendant's alternative argument that the expert testimony be excluded as a sanction under Rule 37 of the Federal Rules of Civil Procedure for failure to comply with this court's scheduling order.

■ Under the scheduling order, the deadline for disclosing expert witnesses was July 19, 2004. (*See* (# 10)). Plaintiff failed to disclose any expert witnesses by July 19, 2004. On July 27, 2004, the United States contacted plaintiff by letter (*see* (# 40) Ex. 10) and asked whether plaintiff was going to rely on any expert reports. On August 2, 2004, plaintiff's counsel stated by email that he would offer Dr. Riden-

our's report as a rebuttal expert. (*Id.*) On August 4, 2004, the United States sent plaintiff's counsel a letter reserving the right to object to Dr. Ridenour's report because plaintiff is the party with the burden of proof and "was required to disclose any expert evidence necessary to prove its prima facie case on or before the date of expert witnesses, July 19, 2004." (*See* (# 40) Ex. 11). On August 13, 2004, plaintiff submitted the "rebuttal report" of Dr. Ridenour. (*See* (# 40) Ex. 12).

"A scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril." *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 610 (9th Cir.1992). A district court's decision to honor the terms of its binding scheduling order does not simply exalt procedural technicalities over the merits of the case. *See id.* Disregard of scheduling orders undermines the court's ability to control its docket, disrupts the agreed-upon course of the litigation, and rewards the indolent and the cavalier. *See id.*

A party "that without substantial justification fails to disclose information required by Rule 26(a) shall not, unless such failure is harmless, be permitted to use as evidence at a trial any information not so disclosed." Federal Rule of Civil Procedure 37(c)(1). If full compliance with Rule 26(a) and 26(e)(1) is not made, Rule 37(c)(1) mandates some sanction, the degree and severity of which are within the discretion of the trial judge. The Ninth Circuit has previously considered the issue of expert preclusion as one possible remedy for failure to comply with Rule In *Wanderer v. Johnston*, 910 F.2d 652, 656 (9th Cir.1990), the Ninth Circuit set out the test to determine the propriety of impos-

argues that the Whysner/Scott report is based upon pure junk science and relies upon reports that make "absolutely no mention of adult cancers, adult plasmacytoma, or adult multiple myeloma." (*See* (# 47) at 9).

ing the sanction of dismissal or default as a remedy for Rule 26 violations. The test requires a court to analyze 1) the public's interest in expeditious resolution of litigation; 2) a court's need to manage its docket; 3) risk of prejudice to the defendants; 4) public policy favoring disposition of cases on their merits; and 5) the availability of less drastic sanctions.

The public and the parties have an interest in expeditious resolution of litigation. Requiring the parties to comply with the Rules of Civil Procedure and with the court's scheduling order promotes achieving such goals by eliminating the need for continuances. Setting forth deadlines allows a court to manage its docket; defendant did not request an extension within which expert disclosure could be submitted. There is no indication that the parties stipulated to an extension of time to file expert disclosures.

Plaintiff offers absolutely no justification for missing the deadline for disclosure of expert reports. Rather, plaintiff appears to be attempting to circumvent this court's scheduling order by representing that Dr. Ridenour's report be admitted as a rebuttal report to the defendant's experts. While "[p]ublic policy favors disposition of cases on their merits, that policy has a procedural as well as a substantive component." *Keener v. U.S.*, 181 F.R.D. 639, 642 (D.Mont.1998). Plaintiff bears the burden of proof in this case and she must produce admissible evidence in her case in chief as to every factor in her negligence claim. The only proof of general and specific causation is the report of Dr. Ridenour.[5] Rather, than produce the expert report in a timely manner, plaintiff, without cause, missed the deadline, waited until defendant's had filed their expert report, and attempted to meet their burden by submitting Dr. Ridenour's report as rebuttal evidence. This court finds and concludes that Dr. Ridenour's report was not filed timely in relation to the court's scheduling order and should be excluded.

### IV. Conclusion

 Dr. Ridenour's report is inadmissible under Fed.R.Evid. 702 and *Daubert*. Additionally, plaintiff failed to comply with this court's scheduling order in filing the report so it is inadmissible. Plaintiff has failed to present admissible evidence on the issue of causation. Accordingly, **IT IS ORDERED** that plaintiff's motion for summary judgment (# 38) be **DENIED** and defendant's motion (# 40) be **GRANTED**.

Let judgment be entered accordingly.

---

**5.** Plaintiff fails to realize that she bears the burden of introducing admissible evidence as to every element of her negligence claim curing her case in chief. The only evidence plaintiff offers regarding general and specific causation is Dr. Ridenour's report. Even assuming that Dr. Ridenour's report were admissible as rebuttal evidence, plaintiff would still fail to produce any evidence of causation during her case-in-chief and defendant would be entitled to a directed verdict.